STATE of Missouri, Respondent,

v.

Martsay BOLDER, Appellant.

No. 62362.

Supreme Court of Missouri,
En Banc.

July 6, 1982.

Rehearing Denied Aug. 2, 1982.

Lori J. Levine, Jefferson City, for appellant.

John Ashcroft, Atty. Gen., Nancy Kelley Baker, Asst. Atty. Gen., Jefferson City, for respondent.

1. All statutory references are to RSMo 1978

WELLIVER, Judge.

Appellant was convicted of capital murder, § 565.001, RSMo 1978,[1] and the jury sentenced him to death pursuant to § 565.-008(1). This Court has jurisdiction for original appeal. Mo.Const. art. V, § 3. Our review includes both consideration of alleged trial errors and review of the death sentence. § 565.014. We affirm both the conviction for capital murder and the sentence of death.

I

The offense occurred in the Missouri State Penitentiary. Appellant Bolder was serving a life sentence for first degree murder.

On March 14, 1979, at approximately 3:15 p. m., vocational teachers Kenneth Giboney and Arthur Luecke were returning by truck from Lincoln University. As they came around the building identified as 5 A & B and headed toward the maintenance and machine shop, Giboney observed what appeared to be two inmates fighting and told Luecke to stop the truck. Both men got out of the truck some thirty feet from the altercation. They saw an inmate, later identified as Theron King, lying against the wall in a partially sitting position. A second inmate, later identified as appellant, was standing over King and making striking or stabbing motions toward King's stomach. King appeared to be trying to move from side to side in an attempt to get out of the way. An unidentified third inmate approached to within two or three feet of the pair and then dropped back with his arms in the air. The inmate later identified as appellant straightened up, backed away from King, and then headed toward the entrance of the 5 A & B building. No others were known to be present at the scene. Neither Giboney nor Luecke saw a weapon at the time.

As appellant headed for the 5 A & B building entrance, King rose and started toward the maintenance and machine shop. Luecke saw blood on King's T-shirt and

unless otherwise indicated.

pursued appellant into the 5 A & B building not more than fifteen seconds behind him. Burt Johnson, another corrections officer who had arrived at the scene, also entered the building and ascended the stairs in pursuit of appellant. When Johnson reached the top of the steps he saw appellant standing behind a desk and wiping blood off his hands with a handkerchief. Appellant was wearing green trousers and a red jacket of the same type Luecke had seen on the man standing over King and making stabbing motions at him. Blood stains on appellant's clothes were of the same type as King's blood. Johnson frisked appellant, found no weapons on him, and took him back downstairs.

A weapon search was conducted in the immediate area of the stabbing. No weapon was found outside at the scene, but a clear plastic bag stained with blood of the same type as King's was found nearby. The plastic folder contained, among other things, inmate paper and appellant's personal correspondence. Prison officials found a knife with fresh blood on it in the 5 A & B building behind a set of padlocked metal doors fifteen to twenty feet down a hallway and to the left of the entrance appellant had been seen entering. A seven-eighths inch space separates the bottom of the doors from the floor. The knife was thin enough to have been slid beneath the doors. When investigation of the area was completed, appellant was taken to the office of Urban Lock, a penitentiary investigator, for questioning.

Officer Homer Jeffries, who had arrived at the scene, saw King walking toward the maintenance and machine shop. He followed King and reached him approximately seventy feet from where he had been stabbed and started to escort him to the prison hospital. After traveling about 100 feet, King said he could go no further. King was then carried to the penitentiary hospital on a stretcher. Dr. Richard Bowers examined King and immediately called in a surgeon, Dr. Alan Doerhoff. King was in shock when Dr. Bowers first saw him at the hospital. King had a one inch laceration on his right shoulder, a two inch lacera-

tion on his back, a one and one-half inch laceration on his right wrist, and a three inch long stab wound in his abdomen.

Dr. Doerhoff arrived at the hospital within forty-five minutes after the stabbing. King's inferior vena cava, which carries blood from the legs, intestines, kidneys, and liver to the heart, was lacerated in the stabbing. Dr. Doerhoff had to massage King's heart with his hand in order to start it pumping again. Because of the seriousness of the wound, Dr. Doerhoff held the inferior vena cava shut with his hand while King was moved into the operating room. King was in surgery for about an hour and fifteen minutes, during which he was given thirteen pints of blood and twenty-four pints of other fluids.

Dr. Doerhoff testified that such a serious injury to the inferior vena cava is fatal ninety percent of the time. The emergency was so great that Dr. Doerhoff did not believe he had time to establish a sterile condition and still save King's life. He performed the operation on King without wearing a mask or cap, although he did wear sterile surgical gloves.

King was then transferred to the University Medical Center. On March 26, 1979, he had surgery to remedy pericarditis, an inflammation of the sac surrounding the heart. King underwent surgery again on April 3, 1979, because he had suffered a heart attack. Various other procedures were conducted in order to determine the cause of an apparent infection in King's abdomen. On April 14, 1979, King had a fourth operation because infection prevented the scar tissue from holding one of his knife wounds closed.

King died April 28, 1979. Dr. Lowery Arnold, who performed the autopsy on King's body, testified that in his medical opinion King died from a generalized infection caused by a stab wound to the abdomen.

Investigator Lock, returning to his office from other duties, found appellant and the guard who had brought him there for questioning. Investigator Lock saw red stains

on appellant's clothing that appeared to be blood and saw a cut on appellant's right index finger and smeared blood on his right hand. Lock asked appellant if he wanted to talk about the incident, and appellant replied that he wanted to talk to Lt. Leroy Looten. Lt. Looten was called and came within minutes. Lt. Looten went into the office, and, at appellant's request, Investigator Lock left the room and closed the door. Lt. Looten spoke with appellant less than a minute, probably not more than thirty to forty-five seconds, and told him only to tell the truth because it would actually be better to do so. Appellant said he was ready to make a statement, and thereupon Investigator Lock was called back into the room. Appellant was read his rights, said he understood them, and signed a waiver. There was no evidence of any promises, threats, or other coercion. Nor was there any allegation that appellant did not understand the waiver he signed. Appellant made no statement before he was read his rights. He refused to make a written statement, but in Lt. Looten's presence he made an oral statement to Investigator Lock.

Appellant's oral statement was offered only in the sentencing phase of the trial.

Investigator Lock testified that appellant said the incident went back four to six months to when King was his cell mate. Appellant said that King knew who murdered appellant's brother but would not tell him. Frank Lindsey became appellant's cell mate after King moved out. Thereafter, King began harrassing appellant and telling others that appellant and Lindsey were engaging in homosexual activities. Appellant said he got tired of such accusations. Appellant said that on March 14 he was walking to the 5 A & B building when he saw King and another inmate sitting on the ledge. They called appellant names as he walked by, and an argument followed. Appellant said he did not like being called

names. He left and returned to the yard with the plastic bag containing papers and correspondence. He got the knife, put it in the plastic bag, and returned to where King was. Appellant asked King what he had said earlier, and King called him "a pussy-assed-nigger." Appellant then pulled out the knife and stabbed King.[2]

## II

■ Appellant argues that the trial court erred in overruling his motion for judgment of acquittal at the close of the state's evidence and in submitting the capital murder verdict directing instruction, MAI–CR2d 15.02, because there was no credible evidence upon which the jury could have found him guilty of (1) stabbing and cutting King, (2) intending to kill King, (3) knowing that he was practically certain to cause King's death, and (4) reflecting fully and cooly upon killing King before doing so. In assessing the sufficiency of the evidence, we must accept as true all evidence and inferences that tend to support the verdict and disregard all evidence and inferences to the contrary. Our inquiry is limited to whether the evidence, viewed in the light most favorable to the state, is sufficient to support the verdict. *State v. Turner*, 623 S.W.2d 4, 6 (Mo. banc 1981); *State v. Strickland*, 609 S.W.2d 392, 395 (Mo. banc 1980).

■ The testimony of a single witness is sufficient to establish the identity of a criminal defendant if the jury believes it beyond a reasonable doubt. *State v. Tucker*, 451 S.W.2d 91, 95 (Mo.1970); *State v. Stockdale*, 415 S.W.2d 769, 771 (Mo.1967); *State v. Williams*, 376 S.W.2d 133, 136 (Mo. 1964). In this case not one witness, but two, observed appellant standing over King and making striking or stabbing motions toward King's stomach. Appellant was found wiping blood off his hands with a handkerchief; his clothes when he was

2. Investigator Lock recounted at the hearing on the motion to suppress appellant's statement that appellant said that when he saw officers he walked into the 5 A & B building and tossed the knife. He said appellant described the knife as a homemade one about ten inches long with a white shaped handle and with a hole in the end of the blade. This testimony, however, was not elicited during the sentencing phase of the trial, and Investigator Lock's written report, which may or may not have included these facts, was not admitted into evidence.

found were of the same type that King's assailant was wearing; and the stains on his clothing were of blood of the same type as King's. Second, the knife wound in King's abdomen severed one of the major blood vessels in the body, and "[a] killing through the use of a deadly weapon on a vital part of the body of the victim is sufficient to permit a finding of intent to kill." *State v. Strickland*, 609 S.W.2d at 394. It makes no difference that King died from an infection resulting from the stabbing rather than from the stabbing itself. Appellant nevertheless is legally responsible. *See State v. Brandt*, 467 S.W.2d 948, 950 (Mo. 1971); *State v. Cooley*, 387 S.W.2d 544, 548 (Mo.1965). Third, the jury could have found from the seriousness of the stab wound that appellant knew he was practically certain to cause King's death. Finally, the jury could have found beyond a reasonable doubt that the killing occurred after premeditation and deliberation, which may be inferred from the circumstances of the homicide, *State v. Strickland*, 609 S.W.2d at 394. Premeditation is present whenever the defendant thinks about the act for any length of time, *id.*, however short, *State v. Wood*, 596 S.W.2d 394, 400 (Mo. banc), *cert. denied*, 449 U.S. 876, 101 S.Ct. 221, 66 L.Ed.2d 98 (1980), before he acts. A finding of deliberation depends not so much upon the time involved as upon an inference reasonably drawn from the evidence and circumstances surrounding the act. *Id.* Appellant's statement was not before the jury during the guilt phase of the trial, but the jury nevertheless could have found premeditation from the facts that the attack occurred in an area not visible from the guard towers, prisoners are not allowed to carry weapons, and there was no evidence of bruises on either King or appellant that would indicate that an altercation preceded the stabbing. Those factors might also indicate deliberation, but, in any event, "[w]ith evidence of provocation lacking, the previously demonstrated intent to kill provided deliberation." *State v. Sturdivan*, 497 S.W.2d 139, 142 (Mo.1973), *overruled on other grounds, State v. Anderson*, 515 S.W.2d 534, 542 (Mo. banc 1974).

The evidence was sufficient to support the verdict.

## III

Appellant raises a number of constitutional challenges to the death penalty and to Missouri's statutory procedures for imposing it, all of which we find meritless.

### A

■ Appellant argues that the death sentence violates the cruel and unusual punishment clause of the eighth amendment and the due process and equal protection clauses of the fourteenth amendment of the United States Constitution. He also argues that it violates the due process clause of Art. I, § 10, the cruel and unusual punishment clause of Art. I, § 21, and the "natural right to life" clause of Art. I, § 2 of the Missouri Constitution. Our discussion in *State v. Newlon*, 627 S.W.2d 606, 612–13 (Mo. banc 1982), *petition for cert. filed*, U.S.L.W. (U.S. May 5, 1982) (No. 81–6660), answers all but the equal protection claim, and we cannot find, and appellant does not offer, a reason for sustaining it. We see no reason to accept appellant's invitation to reconsider our previous holding.

### B

Appellant contends that the sentencing hearing, separated from the guilt phase of the trial, § 565.006(2), is unconstitutional because (1) it unduly burdens his decision whether to testify in his own behalf in violation of the privilege against self-incrimination conferred by the fifth amendment; (2) it denies him adequate assistance of counsel, in contravention of the sixth amendment, because there is inadequate time to prepare for the punishment phase of the trial after conclusion of the guilt phase; and (3) there is no "cooling off" period between the guilt and punishment phases "to permit the jurors an objective, unbiased, unprejudiced examination of the factors they must consider in assessing punishment."

■ Appellant argues with respect to the first contention that the statute "extends pre-sentence hearings only to those criminal defendants charged with and convicted of capital murder," that it is "impossible to predict whether an opportunity will be available to explain or mitigate after the guilt phase or whether [a defendant] should testify during that phase to insure that mitigating evidence reaches the finder of fact," and that a defendant "is forced to choose between his sentencing strategy and testifying during the guilt phase in order that the jury does hear his story." We fail to see how the statute impinges upon appellant's right *not* to testify even if it does indeed burden his decision whether, and when, *to* testify. The facts in this case, furthermore, do not support a theory that the statute deprives appellant of effective assistance of counsel by restricting his strategic options.[3] Appellant, convicted of cap-

3. The state argues that under the plain language of § 565.006 appellant would be entitled to a presentence hearing regardless of which crime· he was found guilty and that his rights, therefore, can in no way be abridged. Section 565.006 provides:

1. At the conclusion of *all trials upon an indictment or information for capital murder heard by a jury*, and after argument of counsel and proper charge from the court, the jury shall retire to consider a verdict of guilty or not guilty without any consideration of punishment, *and by their verdict ascertain, whether the defendant is guilty of capital murder, murder in the first degree, murder in the second degree, manslaughter, or is not guilty of any offense.* In nonjury capital murder cases, the court shall likewise first consider a finding of guilty or not guilty without any consideration of punishment, and by its verdict ascertain, whether the defendant is guilty of capital murder, murder in the first degree, murder in the second degree, manslaughter, or is not guilty of any offense.

2. *Where the jury or judge returns a verdict or finding of guilty as provided in subsection 1 of this section*, the court shall resume the trial and conduct a presentence hearing before the jury or judge at which time the only issue shall be the determination of the punishment to be imposed. In such hearing, subject to the laws of evidence, the jury or judge shall hear additional evidence in extenuation, mitigation, and aggravation *of punishment, including the record of any* prior criminal convictions and pleas of guilty or pleas of nolo contendere of the defendant, or the absence of any such prior criminal convictions and pleas. Only such evidence in aggravation as the prosecution has made known to the defendant prior to his trial shall be admissible. The jury or judge shall also hear argument by the defendant or his counsel and the prosecuting attorney regarding the punishment to be imposed. The prosecuting attorney shall open and the defendant shall conclude the argument to the jury or judge. Upon conclusion of the evidence and arguments, the judge shall give the jury appropriate instructions and the jury shall retire to determine the punishment to be im-

posed. In capital murder cases in which the death penalty may be imposed by a jury or judge sitting without a jury, the additional procedure provided in section 565.012 shall be followed. The jury, or the judge in cases tried by a judge, shall fix a sentence within the limits prescribed by law. The judge shall impose the sentence fixed by the jury or judge. If the jury cannot, within a reasonable time, agree to the punishment, the judge shall impose sentence within the limits of the law; except that, the judge shall in no instance impose the death penalty when, in cases tried by a jury, the jury cannot agree upon the punishment.

3. If the trial court is reversed on appeal because of error only in the presentence hearing, the new trial which may be ordered shall apply only to the issue of punishment. (Emphasis added.) In *State v. Moore*, 615 S.W.2d 108 (Mo.App.1981), the state argued just the opposite—i.e., that the statute provides for a presentence hearing only when a defendant is charged with *and convicted* of capital murder—and prevailed. Regardless of whether appellant's argument is meritorious, a question we expressly do not decide, the state's inconsistency gives us cause for concern. Furthermore, the state neglects to point out that § 565.006 was amended by H.B.251, 80th Gen. Assem., 1st Reg.Sess., 1979 Mo.Laws 634. The amended version became effective September 28, 1979, before the trial in this case. The amendment changed subsection (1) to read as follows:

At the conclusion of all trials upon an indictment or information for capital murder heard by a jury, and after argument of counsel and proper charge from the court, the jury shall retire to consider a verdict of guilty or not guilty without any consideration of punishment. In nonjury capital murder cases, the court shall likewise first consider a finding of guilty or not guilty without any consideration of punishment. *In each jury capital murder case, the court shall not give instructions on any lesser included offense which could not be supported by the evidence presented in the case.*
§ 565.006(1), RSMo Supp.1981 (emphasis added). The amendment deleted the language of

ital murder, received a presentence hearing and thus *was* given an opportunity to present his story to the jury. He chose not to do so. In fact, appellant offered no evidence at all at either the guilt or sentencing phase of the trial.

■ Both appellant's second and third contentions concern the time between the guilt and sentencing phases of the trial. In *State v. Royal*, 610 S.W.2d 946, 950 (Mo. banc 1981), we rejected the claim that the time between the phases is insufficient for a convicted defendant to prepare his arguments for the sentencing phase. The rationale we applied in that case applies with equal force to appellant's third argument here that the jury has an insufficient time in which to "cool off" after rendering a verdict of guilty. We noted that "rather than work a hardship on a defendant, the bifurcated system is 'an extension of a high order of the process due the accused.'" *Id.* at 950. The United States Supreme Court said in *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), that

> [w]hen a human life is at stake and when the jury must have information prejudicial to the question of guilt but relevant to the question of penalty in order to impose a rational sentence, a bifurcated system is more likely to ensure elimination of the constitutional deficiencies identified in [*Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972)].

*Id.* at 191–92, 96 S.Ct. at 2933–34. Appellant concedes that "[a]rguably, the legislature need not have extended individualized sentencing hearings of the type established by § 565.006." Doubtless the jury will be less prone to impose a sentence under passion in a bifurcated system, in which there is at least some time in which it can "cool off," than it would were it to impose the

sentence at the same time it determines guilt.

### C

■ Appellant next contends that the aggravating circumstance the jury found in this case, that "[t]he capital murder was committed by a person in ... the lawful custody of a ... place of lawful confinement," § 565.012(2)(9), is unconstitutional because it subjects prisoners because of their status as such to a more severe penalty than it does other members of society.

Unless a statute creates a classification that burdens a suspect group or impinges upon a fundamental interest, "we will not overturn [it] unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the legislature's actions were irrational." *Vance v. Bradley*, 440 U.S. 93, 97, 99 S.Ct. 939, 942, 59 L.Ed.2d 171 (1979). In short, "[u]nless a classification trammels fundamental personal rights or is drawn upon inherently suspect distinctions such as race, religion, or alienage, our decisions presume the constitutionality of the statutory discriminations and require only that the classification challenged be rationally related to a legitimate state interest." *Friedman v. Rogers*, 440 U.S. 1, 17, 99 S.Ct. 887, 898, 59 L.Ed.2d 100 (1979) (quoting *City of New Orleans v. Dukes*, 427 U.S. 297, 303, 96 S.Ct. 2513, 2516, 49 L.Ed.2d 511 (1976)). Prisoners have never been held to constitute a suspect class. Furthermore, it is they whom society has deemed should be deprived, to a significant degree, of their liberty, and thus the classification here involved cannot be said to impinge upon "fun-

the old subsection (1) that allowed conviction for first or second degree murder or manslaughter in an apparent attempt to provide for a presentence hearing only after a defendant is convicted of capital murder. The italicized language added to the amended version, however, allows the trial judge to instruct on lesser included offenses. That language appears to imply, although we do not decide, that the trier of fact can return a verdict or finding of guilty on

a lesser included offense and that under subsection (2), the language of which was unchanged by the amendment, a presentence hearing would be held even if the defendant were found guilty of a crime other than capital murder. We have never passed upon the rationale that the court of appeals articulated in *Moore*, and we do not do so now. Neither do we decide whether it would apply to the amended version of § 565.006.

damental personal rights." The rational relationship standard is therefore the appropriate one by which to gauge the constitutionality of § 565.012(2)(9), and under this test the statute passes muster. The United States Supreme Court has noted that besides the "two principal social purposes" of capital punishment, "retribution and deterrence of capital crimes by prospective offenders," a third purpose "is the incapacitation of dangerous criminals and the consequent prevention of crimes that they may otherwise commit in the future." *Gregg v. Georgia*, 428 U.S. at 183 & n.28, 96 S.Ct. at 2929 & n.28. The latter is one purpose underlying § 565.012(2)(9). In this case appellant was already serving a life sentence for first degree murder. That sentence did not deter him from committing a second murder. The legislature, in adopting § 565.012(2)(9), reasonably could have concluded that the death penalty is appropriate when imprisonment already imposed does not deter capital murder. The imposition of capital punishment is rationally related to the state's obviously legitimate interests in preventing crime and protecting other persons, such as prison employees and other inmates, with whom prisoners come in contact.

▆ For this reason we also reject appellant's contention that the jury exceeded the scope of its charge when, after finding the aggravating circumstances that "the defendant has a prior criminal conviction for murder in the first degree"[4] and that "at the time of the murder of Theron King the defendant was in the [l]awful custody of a place of confinement,"[5] it opined that it "appears the life sentence [that appellant was already serving] was no deterant [sic] to further crime." The jury's excess verbiage was not, as appellant argues, an attempt to find another aggravating circumstance. It was, rather, nothing more than the jury's expression of the rationale underlying the statutory aggravating circumstance that it already had found.

### D

Appellant argues that § 565.012 is unconstitutional because (1) subsection (1)(4), which requires the sentencing authority to consider "whether a sufficient mitigating circumstance or circumstances exist which outweigh the aggravating circumstance or circumstances found to exist," impermissibly places the burden on the defendant to negate the aggravating circumstances; (2) the jury is not required to find beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating circumstances; and (3) the application of the statutory aggravating circumstances in subsection (2) creates a new crime for which a defendant can be convicted without first being charged.

▆ Appellant's argument with respect to the burden of proof is misconceived. The existence of one or more aggravating circumstances not outweighed by the mitigating circumstances does not mean that the death penalty must be imposed automatically. The jury's finding that one or more statutory aggravating circumstances exist is the threshold requirement that must be met before the jury can, after considering all the evidence, recommend the death sentence. The jury cannot impose death if it finds that the mitigating circumstances outweigh the aggravating circumstances, but that situation is the only one in which the punishment is mandated. Under no circumstances is the jury obliged to impose death. "The jury is not required to find any mitigating circumstance in order to make a recommendation of mercy that is binding on the trial court, . . . but it must find a *statutory* aggravating circumstance before recommending a sentence of death." *Gregg v. Georgia*, 428 U.S. at 197, 96 S.Ct. at 2936. Indeed, the jury was instructed in Instruction No. 21 that "[e]ven if you decide that a sufficient mitigating circumstance or

---

4. This is a nonstatutory aggravating circumstance that the jury could consider under § 565.012(1)(3).

5. This is a statutory aggravating circumstance, § 565.012(2)(9), that the jury could consider under § 565.012(1)(1).

circumstances do not exist which outweigh the aggravating circumstance or circumstances found to exist, you are not compelled to fix death as the punishment."

■ We do not believe, as appellant contends, that the Constitution requires that the jury find beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating circumstances. Guilt must of course be established beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 90 S.Ct. 1868, 25 L.Ed.2d 368 (1970). So also must the statutory aggravating circumstance or circumstances upon which the jury bases its recommendation of death. § 565.012(1)(4). *See Gregg v. Georgia*, 428 U.S. at 196–97, 96 S.Ct. at 2936. The imposition of punishment, however, is not a matter resolved by the determination of fact alone. It is a more subjective process in which "there [must] be taken into account the circumstances of the offense together with the character and propensities of the offender." *Id.* at 189, 96 S.Ct. at 2932 (quoting *Pennsylvania ex rel. Sullivan v. Ashe*, 302 U.S. 51, 55, 58 S.Ct. 59, 60, 82 L.Ed. 43 (1937)). It suffices to say that in *Proffit v. Florida*, 428 U.S. 242, 250–53, 257–58, 96 S.Ct. 2960, 2965–67, 2969, 49 L.Ed.2d 913 (1976), the United States Supreme Court thoroughly considered this statutory balancing process and found no constitutional infirmity. The Court stated that

> [w]hile the various factors to be considered by the sentencing authorities do not have numerical weights assigned to them, the requirements of *Furman* are satisfied when the sentencing authority's discretion is guided and channeled by requiring examination of specific factors that argue in favor of or against imposition of the death penalty, thus eliminating total arbitrariness and capriciousness in its imposition.
>
> The directions given to judge and jury by the . . . statute are sufficiently clear and precise to enable the various aggravating circumstances to be weighed against the mitigating ones. As a result,

the trial court's sentencing discretion is guided and channeled by a system that focuses on the circumstances of each individual homicide and individual defendant in deciding whether the death penalty is to be imposed.

*Id.* at 258, 96 S.Ct. at 2969.

■ We therefore also reject appellant's argument that the application of the statutory aggravating circumstances creates a new crime for which appellant can be convicted without first being charged. Appellant argues that capital murder for which the death penalty can be imposed is "a crime separate from capital murder with the penalty of life in prison and fifty years without parole." That analysis is flawed. The crime—capital murder—is the same in both instances. The existence of aggravating or mitigating circumstances relates not to guilt but to the punishment therefor.

### E

Appellant argues that § 565.014 is unconstitutional (1) because the lack of similar cases in Missouri gives this Court no standard by which to determine under subsection (3)(3) "[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant"; and (2) because subsections (3) and (5) do not require this Court "to consider all murder cases wherein the defendant had, at any point in the proceedings, been charged or chargeable with capital murder" and there therefore is no adequate standard of review.

■ Appellant's argument with respect to the first contention is that "only seven persons in the State of Missouri have been assessed the death penalty and in no case are the facts similar to those in the case at bar."[6] This argument presupposes that we can consider only those cases in which the death penalty has been imposed under the law effective May 26, 1977. Such is not the case. Our concern is that there be "evenhanded, rational, and consistent imposition

---

**6.** Currently, 17 men are on death row in the    Missouri State Penitentiary.

of death sentences under law." *Jurek v. Texas*, 428 U.S. 262, 276, 96 S.Ct. 2950, 2958, 49 L.Ed.2d 929 (1976). Our inquiry would be unduly slanted were we to compare only those cases in which the death penalty has been imposed. We therefore can consider as similar "[t]hose cases in which both death and life imprisonment were submitted to the jury." *State v. Mercer*, 618 S.W.2d 1, 11 (Mo. banc), *cert. denied,* —— U.S. ——, 102 S.Ct. 432, 70 L.Ed.2d 240 (1981). *See Gregg v. Georgia*, 428 U.S. at 204 n.56, 96 S.Ct. at 2939 n.56. Included are those cases that have been affirmed on appeal, *State v. Mercer*, 618 S.W.2d at 11, and those that have been reversed if the reversal was predicated upon the disproportionality of the sentence, *e.g., State v. McIlvoy*, 629 S.W.2d 333 (Mo. banc 1982). We may also consider cases pending before this Court in order to determine what penalties juries have imposed in factually similar situations. *See State v. Williams*, 392 So.2d 619, 626 (La. 1980); *State v. Williams*, 205 Neb. 56, 75, 287 N.W.2d 18, 29 (1979), *cert. denied*, 449 U.S. 891, 101 S.Ct. 255, 66 L.Ed.2d 120 (1980). Appellant's argument, carried to its logical conclusion, would mean that our capital punishment statute was unconstitutional from the instant it became effective because at that point there were no similar cases for comparison.[7] We cannot accept this rationale.

■ Neither do we accept the argument that we must consider all murder cases in which the defendant had at some point in the proceedings been *charged or chargeable* with capital murder. The Supreme Court in *Gregg* rejected an analogous claim of unconstitutionality based on "the opportunities for discretionary action that are inherent in the processing of any murder case" because "[n]othing ... suggests that the decision to afford an individual defendant mercy violates the Constitution." 428 U.S. at 199, 96 S.Ct. at 2937. Relevant cases for a review of the appropriateness of the sentence are those in which the judge or jury first found the defendant guilty of capital murder and thereafter chose between death or life imprisonment without the possibility of parole for at least fifty years.[8] Our comparison therefore need not include cases such as those in which the state chose not to charge a defendant with capital murder, the state agreed to a plea bargain whereby a defendant pled guilty to a lesser charge, the conviction was for an offense less than capital murder, or the state waived the death penalty.

## F

■ Appellant's final challenge to the constitutionality of the system is that the bifurcated capital murder procedure denies him equal protection of the laws. His argument is that he is charged with capital murder, a decision wholly within the prosecutor's discretion, and thus is subject to the bifurcated process; that his prior convictions and other aggravating circumstances thus can be used against him; that the trial court is required to instruct the jury on second degree murder and manslaughter as lesser offenses included within capital murder; that defendants charged with second degree murder or manslaughter are not subject to the bifurcated process and cannot have prior convictions and aggravating circumstances used against them; and that therefore appellant bears a greater burden than do defendants charged with second degree murder or manslaughter.

7. The United States Supreme Court has found no constitutional infirmity in the comparison of cases decided under old capital punishment statutes "at the inception of the new procedure in the absence of any post-*Furman* capital cases available for comparison." *Gregg v. Georgia*, 428 U.S. 153, 205 n.56, 96 S.Ct. 2909, 2940 n.56, 49 L.Ed.2d 859 (1976). We have not found it necessary to do so.

8. This was implicit in our decision in *State v. Mercer*, 618 S.W.2d 1 (Mo. banc 1981). In

*Mercer* a majority of the Court rejected Judge Seiler's argument in dissent that "similar cases" within the meaning of § 565.014.3(3) encompasses "all cases in which the state waived the death penalty, all cases in which life imprisonment was given and no appeal taken, ... and all cases in which capital murder was charged but the jury found defendant guilty of a lesser crime than capital murder." *Id.* at 20–21 (Seiler, J., dissenting).

This argument is spurious. Appellant was convicted of capital murder, not second degree murder or manslaughter. He makes no contention that the capital murder sentencing procedure is applied differently among defendants convicted of that offense. Whether defendants charged with capital murder but convicted of a lesser offense are denied equal protection is of no concern to him whatsoever.[9] His equal protection rights have not been abridged.

## IV

Appellant next makes three arguments concerning questions the prosecutor asked veniremen about their views on the death penalty and the trial court's dismissal of one venirewoman for cause.

■ Appellant first contends that the trial court committed constitutional error when it overruled his motion to prohibit the prosecutor from asking jurors whether they objected to or opposed capital punishment. He argues that allowing the state to challenge for cause or peremptorily strike veniremen opposed to the death penalty will produce a jury that is conviction, rather than death penalty, prone. We rejected this argument in *State v. Mercer*, 618 S.W.2d at 7–8, and *State v. Mitchell*, 611 S.W.2d 223, 229 (Mo. banc 1981). Nevertheless, appellant, citing *Griggs v. Mabry*, 637 F.2d 525 (8th Cir. 1980), requests for the first time on appeal that he be granted an evidentiary hearing to show that his death-qualified jury was biased toward conviction and that he thereby was prejudiced. The Supreme Court in *Witherspoon v. Illinois*, 391 U.S. 510, 517, 88 S.Ct. 1770, 1774, 20 L.Ed.2d 776 (1968), noted that evidence is "too tentative and fragmentary to establish that jurors not opposed to the death penalty tend to favor the prosecution in the determination of guilt." Since *Witherspoon* several scholars have conducted empirical studies in an attempt to prove or disprove the

hypothesis. As we recently noted, however, "[t]he studies . . . are not conclusive." *State v. Mercer*, 618 S.W.2d at 7–8. Since we have before us neither evidence of nor allegation of other evidence of jury bias, we deny his request for an evidentiary hearing.

■ Appellant next argues that the trial court violated *Witherspoon* in overruling his motion in limine because the prosecutor thus was allowed to ask questions not aimed at exposing an "unmistakably clear predisposition or irrevocable opposition" to capital punishment that "makes it impossible for a juror to make a finding of guilt regardless of the evidence presented." *Witherspoon* applies to the answers elicited from veniremen rather than the questions asked on voir dire. Furthermore, nothing in *Witherspoon* indicates that a venireman may be excused for cause only if his view of the death penalty would prevent him from *ever* returning a verdict of guilty. The Supreme Court in *Witherspoon* stated, rather, that veniremen may be excused for cause if they make "unmistakably clear . . . that their attitude toward the death penalty would prevent them from making an *impartial decision* as to the defendant's *guilt*." 391 U.S. at 522–23 n. 21, 88 S.Ct. at 1776–77 n.21 (some emphasis added). *See also Adams v. Texas*, 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980) ("[t]he State may insist . . . that jurors will consider and decide the facts impartially").

■ We also reject appellant's third contention that the trial court erred in excluding for cause one member of the jury panel. After venirewoman Bealmer indicated her scruples against capital punishment, the following occurred:

[PROSECUTOR]: Would the fact that the death penalty is there, would that affect your ability to judge the *facts*?

VENIRE[WOMAN] BEALMER: Yes.[10]

---

**9.** We intimate no view on whether all defendants charged with, or only those convicted of, capital murder are subject to the bifurcated procedure. *See* note 3 *supra*.

**10.** The entire colloquy was as follows:

[PROSECUTOR]: . . .

The judge told you the charge here is murder, the charge of capital murder that has been lodged against the defendant Martsay

(Emphasis added.) Thereafter the trial court, without objection from appellant, sustained the prosecutor's challenge for cause. We find no *Witherspoon* violation. The question was specific, and the answer was unequivocal. Because of her view toward the death penalty, the venirewoman could not have determined appellant's guilt impartially.

## V

Appellant contends that the trial court erred in refusing to grant a continuance and in forcing him to go to trial in chains and prison clothing and with an armed guard at his side. He argues that he was not given time to calm down and that his appearance in such a condition prejudiced the jury against him.

■ Appellant's trial began May 5, 1980. At a conference before voir dire, appellant orally requested a continuance in order to interview four potential witnesses, all inmates in the penitentiary. Appellant's appointed counsel stated that he had told appellant that appellant would present no evidence until at least May 6. The trial court denied the continuance and indicated that it would issue subpoenas for the four potential witnesses so that they would be available for interviewing the morning of May 6. We cannot say that the trial court abused the sound discretion it has in determining whether to grant a continuance in a criminal case. *See State v. Oliver,* 572 S.W.2d 440, 445 (Mo. banc 1978).

■ The trial court also has discretion whether to order a defendant restrained whenever it is necessary to maintain order and security in the courtroom. *Illinois v. Allen,* 397 U.S. 337, 343, 90 S.Ct. 1057, 1060, 25 L.Ed.2d 353 (1970); *State v. Richards,* 467 S.W.2d 33, 38 (Mo.1971). Given appellant's recalcitrance, the trial court was justified in ordering appellant bound. Appellant, upset with the trial court's refusal to grant the continuance and to remove appellant's appointed counsel, overturned a library table in the pretrial conference and scuffled with guards approximately five minutes; knocked over his chair in the courtroom while attempting to rise and had to be subdued by guards; resisted being placed in his chair and required four guards to hold him; and continually asserted that he would not remain in the courtroom. The trial court repeatedly told appellant that he would not be bound if he promised to behave. He did not. Appellant contends, nevertheless, that he should not have been shackled past the first day of trial. Given appellant's actions, and the fact that appellant had been convicted of

---

Bolder, I indicate to you right now we intend to seek the death penalty on the case. Is there anyone here on the first row who because of either religious or moral scruples against the death penalty you don't think you would be able to find someone *guilty on the charge of capital murder?*

VENIRE[WOMAN] BEALMER: Yes.

[PROSECUTOR]: Let me ask you again, you indicate that because of scruples against the death penalty you don't believe you could find someone *guilty of capital murder?*

VENIRE[WOMAN] BEALMER: I don't think so.

[PROSECUTOR]: If the State of Missouri—If the jury returns a verdict of guilty of capital murder you go into the second phase of the trial, then the issue is punishment. After the issue is presented to the jury the jury still has to assess the death penalty or life imprisonment. Knowing that, do you think it would interfere with your ability to judge the facts on the guilt stage of capital murder?

VENIRE[WOMAN] BEALMER: Do I have to answer yes or no?

[PROSECUTOR]: You have to answer as best you can and as truthful as you can.

VENIRE[WOMAN] BEALMER: Well that is bad, I don't like death, but—

[PROSECUTOR]: Let me ask you this: Do you think, knowing that if your verdict is based on the fact that the death penalty is there in the background, do you think that would interfere with your ability to judge the facts, would you impose a burden of proof greater on me if the death penalty—

[DEFENSE COUNSEL]: I object, he is beginning to argue with the juror.

THE COURT: Sustained.

[PROSECUTOR]: *Would the fact that the death penalty is there, would that affect your ability to judge the facts?*

VENIRE[WOMAN] BEALMER: *Yes.*

(Emphasis added.)

one murder and was on trial for another, the trial court could reasonably have believed that another disturbance might be forthcoming if appellant were not bound. Furthermore, there was no evidence of prejudice.[11] The trial court did not abuse its discretion.

■ Appellant was not compelled to appear before the jury in identifiable prison clothing. See Estelle v. Williams, 425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976). Appellant was offered civilian clothing, but he said there was none his size and that he was "not going to put no small clothes on." At another point before the trial the court asked appellant whether he wished to put on civilian clothing before he went into the courtroom, and appellant, nonresponsive, replied, "I am not going in the courtroom." Appellant at no time objected to wearing prison clothing during the trial. "[T]he failure to make an objection to the court as to being tried in such clothes, for whatever reason, is sufficient to negate the presence of compulsion necessary to establish a constitutional violation." Id. at 512–13, 96 S.Ct. at 1696–97. Appellant cannot now be heard to complain.

### VI

Appellant next argues that the trial court erred in admitting State's Exhibit No. 18, the knife allegedly used to stab Theron King, and State's Exhibit No. 9, a photograph thereof. He contends that there was no evidence tending to prove that the knife had ever been in his possession or that it had been used to inflict the deadly wounds.

■ Demonstrable evidence is admissible "if it throws any relevant light upon a material matter at issue," State v. Murphy, 592 S.W.2d 727, 730 (Mo. banc 1979), or if it "tends to establish any fact in issue or . . . aid the jury in any way in arriving at a correct verdict," State v. Holmes, 609 S.W.2d 132, 136 (Mo. banc 1980). "Articles, instruments and weapons that have a tendency to explain the manner in which a crime was committed that are found at or near the scene of the crime subsequent to the commission of a crime are generally admissible." State v. Neal, 591 S.W.2d 178, 180 (Mo.App.1979). The trial court has discretion whether to admit or exclude demonstrable evidence. State v. Murphy, 592 S.W.2d at 730.

■ It is true that none of the witnesses who testified at trial ever saw the knife in appellant's possession. Nevertheless, there is evidence linking appellant to the knife and linking both appellant and the knife to the attack. Appellant was seen standing over King and making stabbing motions toward his stomach. Appellant was later found in the 5 A & B building wiping blood off his hands. The knife was found in a room off the hall in 5 A & B building that was fifteen to twenty feet from the doors appellant was seen entering. The steel doors to the room in which the knife was found were padlocked, but the seven-eighths inch space between the floor and the bottom of the doors was large enough for the knife to slide through. There were no detectible fingerprints on the knife, but the knife when found was still wet with blood that matched the blood of the victim, and the blood on appellant's clothes matched that of the victim.[12] This

---

11. The jurors questioned under oath during the hearing on the motion for new trial stated that they had not discussed the facts that appellant was shackled and an armed guard was present and that those facts did not influence their decision. The four venirewomen who indicated on voir dire that the presence of the guard would affect their impartiality did not serve on the jury.

12. Dr. Kwei Lee Su, a Missouri State Highway Patrol forensic serologist, testified that Theron King possessed type O blood, which approximately 45% of Americans possess. Dr. Kwei

also testified that King's blood contained factor PGM1. PGM1, an enzyme, is inherited independently of the ABO system and thus is a further discriminating genetic factor. See State v. Rolls, 389 A.2d 824 (Me.1978). The blood on appellant's clothing was type O and contained factor PGM1. Dr. Kwei was able to determine that the blood on the knife was type O, but because of the small quantity she was unable to test it for factor PGM1. Appellant argues, therefore, that "[t]he most this knife could represent is only that there are knives in the pris-

evidence linked appellant with the knife sufficiently to justify admission of the knife and the photograph into evidence.[13] The trial court did not abuse its discretion.

## VII

Appellant contends that the trial court erred in overruling his motion to suppress the oral statement that he made to Investigator Lock the afternoon of the stabbing. He claims (1) that the oral statement was made after he had refused to make a written statement and after he had already cut off interrogation with one officer; (2) that he made the statement under duress and coercion and was not advised of his right to remain silent; and (3) that he made no knowing and intelligent waiver of his right to remain silent and that the trial court failed to find that his statement was voluntary.

Appellant's view of the facts is contrary to the uncontradicted testimony elicited at the suppression hearing. Appellant bases his first argument upon the statement in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), that

> [o]nce warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege[.]

*Id.* at 473–74, 86 S.Ct. at 1627 (footnote omitted). Yet the uncontradicted testimony showed that when Investigator Lock told appellant that he wanted to talk with him about the stabbing, appellant replied that he wanted to talk with Lt. Looten.

Appellant at that point would not speak with Investigator Lock, but his statement cannot be construed as an indication that he desired to remain silent. He wanted instead to speak with another officer.

■ Appellant was advised of his rights and made a knowing and intelligent waiver of his right to remain silent. After speaking with Lt. Looten, appellant said he was ready to make a statement, and Investigator Lock thereupon was summoned back into the room. Appellant was read his rights, said he understood them, and signed the waiver. There was no coercion by the authorities. Lt. Looten testified that appellant was not shackled during the interrogation, and Investigator Lock testified that no promises were made and that appellant was not beaten, struck, or otherwise threatened or coerced.[14] Appellant's refusal to make a written statement has in this situation no bearing on the voluntariness of his oral statement. Investigator Lock testified that appellant "said he would not [make a written statement], he did not like to give written statements and he just as soon tell Lieutenant Looten and I what occurred and leave it at that." The trial court in overruling the motion to suppress implicitly found that the statement was voluntary, *see State v. Royal*, 610 S.W.2d at 949, and the record supports that finding. The trial court did not err in overruling the motion to suppress.

## VIII

Section 565.014(1) mandates that we review the death sentence when it is imposed. Having found no error among appellant's assignments of error, we turn to a consideration of the punishment.

Section 565.014(3) provides:

---

on with the same blood type as Theron King, a blood type which is experienced by approximately 45% of the United States population." This objection of remoteness, however, goes to the weight to be accorded the evidence rather than to its admissibility, because this evidence is not so remote that it is entirely without materiality. *State v. Feger*, 340 S.W.2d 716, 725–26 (Mo.1960).

13. Appellant makes no argument on appeal that admission of the photograph was cumula-

tive and thus error. We therefore do not address this question.

14. Appellant testified for the first time at the hearing on his motion for new trial that Investigator Lock slapped him approximately five times, struck him four times with a stick or wooden table or chair leg, and cut his hand during the interrogation. He also testified, however, that his "hand got cut on the fence or wall."

With regard to the sentence, the supreme court shall determine:

(1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; and

(2) Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in section 565.012; and

(3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

■ Our review of the entire record convinces us that the sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor.

Section 565.012(2)(9) provides as a statutory aggravating circumstance that "[t]he capital murder was committed by a person in ... the lawful custody of a ... place of lawful confinement." The jury so found. There is no contention in this case that appellant was not an inmate at the Missouri State Penitentiary at the time of the murder.

Our final consideration is whether the death penalty, taking into account both the crime and the defendant, is excessive or disproportionate to the penalty imposed in similar cases. Since the enactment of our current capital murder statute, § 565.001, this Court has reviewed and affirmed only two death sentences. *State v. Newlon*, 627 S.W.2d 606 (Mo. banc 1982), *petition for cert. filed*, U.S.L.W., (U.S. May 5, 1982) (No. 81–6660); *State v. Mercer*, 618 S.W.2d 1 (Mo. banc), *cert. denied*, —— U.S. ——, 102 S.Ct. 432, 70 L.Ed.2d 240 (1981). We have reversed one death sentence because of its disproportionality. *State v. McIlvoy*, 629

S.W.2d 333 (Mo. banc 1982). In addition to *Newlon* and *Mercer*, we have affirmed twelve capital cases in which the choice of death or life imprisonment without possibility of parole for fifty years was submitted to the jury. *State v. Greathouse*, 627 S.W.2d 592 (Mo.1982); *State v. Bostic*, 625 S.W.2d 128 (Mo.1981); *State v. Thomas*, 625 S.W.2d 115 (Mo.1981); *State v. Emerson*, 623 S.W.2d 252 (Mo.1981); *State v. Turner*, 623 S.W.2d 4 (Mo. banc 1981); *State v. Jensen*, 621 S.W.2d 263 (Mo.1981); *State v. Baskerville*, 616 S.W.2d 839 (Mo.1981); *State v. Mitchell*, 611 S.W.2d 223 (Mo. banc 1981); *State v. Williams*, 611 S.W.2d 26 (Mo. banc 1981); *State v. Royal*, 610 S.W.2d 946 (Mo. banc 1981); *State v. Borden*, 605 S.W.2d 88 (Mo. banc 1980); *State v. Downs*, 593 S.W.2d 535 (Mo.1980).

■ This is the first case we have reviewed in which the jury imposed the death penalty after finding as a statutory aggravating circumstance that the defendant was lawfully confined at the time of the murder. Two other such cases are pending before us, and in both of those the jury imposed the death penalty. *State v. Shaw*, No. 62679 (Mo. banc argued May 17, 1982); *State v. Trimble*, No. 62523 (Mo. banc argued Sept. 15, 1981).[15] After considering these cases and those cited above, we conclude that the death penalty imposed in this case is neither excessive nor disproportionate to the punishment imposed in similar cases. The life sentence that appellant is already serving for first degree murder did not deter appellant from committing still another murder. The imposition of yet another life sentence would serve no purpose other than to signal that there is no real cost for prisoners who kill while in confinement.[16]

**15.** We consider these cases only to ascertain what punishment juries have imposed in factually similar cases. In so doing we intimate no view concerning their ultimate disposition.

**16.** It is significant to note that the United States Supreme Court has suggested that an intentional killing by a prisoner serving a life sentence or convicted of an unrelated murder presents a unique problem that may justify *mandatory* imposition of the death penalty.

*Roberts v. Louisiana*, 428 U.S. 325, 334 n.9, 96 S.Ct. 3001, 3006 n.9, 49 L.Ed.2d 974 (1976); *Gregg v. Georgia*, 428 U.S. 153, 186, 96 S.Ct. 2909, 2931, 49 L.Ed.2d 859 (1976). *See Lockett v. Ohio*, 438 U.S. 586, 604 n.11, 98 S.Ct. 2954, 2964 n.11, 57 L.Ed.2d 973 (1978); *Roberts v. Louisiana*, 431 U.S. 633, 637 n.5, 97 S.Ct. 1993, 1995 n.5, 52 L.Ed.2d 637 (1977); *Woodson v. North Carolina*, 428 U.S. 280, 287 n.7, 292–93

The judgment is affirmed.

Date of execution set for August 20, 1982.

DONNELLY, C. J., and RENDLEN, MORGAN and HIGGINS, JJ., concur.

SEILER, J., dissents in separate dissenting opinion filed.

BARDGETT, J., dissents and concurs in separate dissenting opinion of SEILER, J..

SEILER, Judge, dissenting.

I respectfully dissent as to the review of the death sentence. In my opinion the sentence of death is excessive and disproportionate in this case.

As the principal opinion points out, this is the first case we have reviewed in which the jury imposed the death penalty after finding as a statutory aggravating circumstance that the defendant was lawfully confined at the time of the murder. The principal opinion, however, takes into consideration two other such cases pending before us, State v. Shaw, No. 62679 and State v. Trimble, No. 62523, but says nothing as to their facts, an aspect which is essential in determining whether they are similar to the present case. Based on the briefs and the oral arguments before this court in these two cases, there was evidence in the record supporting the verdicts as follows:

In Trimble, the defendant was in jail, charged with sodomy, rape, sexual abuse in the first degree and kidnapping of two nine year old girls. He was a large man, six feet, one inch in height, weighing 210 pounds. The victim, whom I will refer to only by his first name, Jerry, was age 20, five feet, ten inches in height, weight 145 pounds, quiet, shy, mentally slow, and "scared to death". He was in jail on a charge of auto theft. Trimble would pinch, tease, and harass Jerry and when Jerry was asleep would put lighted matches between his toes. Trimble declared he wanted Jerry as his "punk", i.e., homosexually; further, that he did not want to go to prison on the charges involving the two young girls be-

n.25, 96 S.Ct. 2978, 2983 n.7, 2985 n.25, 49

cause other prisoners did not like persons who committed crimes of that kind and to avoid this problem he intended to commit a capital murder.

He forced Jerry to don a bra, punched him, and repeatedly forced him to submit to oral and anal sex acts, forced him to kiss others, and to display a rag which had been stuffed in his anus, burned initials into his arm, referred to him as his "woman" and forced Jerry to write a suicide note to his parents. Later Trimble gagged Jerry with a towel, told him they were going to play a "hangman's game", looped a knotted towel around his neck, set his knees against Jerry's back and proceeded to choke the victim to death over a period of fifteen minutes, breaking one of the neck vertebrae in the process. Trimble then attempted to make the death appear as a suicide, and forced the other jail inmates to agree to tell the guards it was a suicide on penalty of the same thing happening to them.

In Shaw, the defendant, serving a life sentence for first degree murder, intended to kill one of the guards, officer Clinton Wyrick, the uncle of the warden. Shaw entered the vegetable room, seized two butcher knives, and, without warning, plunged one into the side of the officer (Farrow) who was in charge of the knives, killing him (Farrow died within the hour from loss of blood). Shaw then went in search of officer Wyrick, found him in the commissary, attacked Wyrick with both butcher knives, the attack lasting 30 to 45 seconds, with numerous wounds on Wyrick's arms, chest and stomach. Wyrick took thirteen months to recuperate.

Any murder is serious and reprehensible, but the murder in the present case is hardly comparable in viciousness or extremes to the murders in the Trimble and Shaw cases. The main similarity is that the instant case also occurred in a place of confinement. If the murder in the present case had occurred in a tavern or on a parking lot or elsewhere outside the prison walls, by someone not in confinement, there would have been no rea-

L.Ed.2d 944 (1976).

sonable likelihood, in my opinion, of the prosecutor being able to obtain a capital murder conviction, much less the death penalty. It would work out as a second degree murder case.

In addition to the *Trimble* and *Shaw* cases above, the principal opinion considers the two cases where the death sentence has been affirmed (*Newlon* and *Mercer*), one case where the death sentence has been reversed because of disproportionality (*McIlvoy*), and twelve capital cases where the jury affixed punishment at life imprisonment without possibility of parole for fifty years rather than death.

This is like trying to compare apples and oranges. None of the twelve cases involved persons in lawful confinement. Without exception the killings in the twelve cases were far more extreme and horrendous than here and, finally, even so in none of the twelve was the death penalty inflicted. To the extent the cases are comparable they demonstrate that the death penalty in the present case is excessive and disproportionate.

The same is true of the killings in the *Newlon, Mercer* and *McIlvoy* cases. None involved persons in confinement and each of those killings is far more extreme and horrendous than that in the present case, yet even in these instances, in one case— *McIlvoy*—the death penalty was declared excessive and disproportionate. If that were true in *McIlvoy*, it certainly is true here.

The real rationale of the principal opinion lies in the belief that anything less than death for this defendant would be no more than a slap on the wrist, as he is already serving a life sentence for first degree murder. This assumes that this particular defendant would actually have served for life under his first degree murder charge, an assumption which has no factual basis.

It is common knowledge that today "life" imprisonment is a misnomer.[1] Only a small percentage of inmates with life sentences

serve for life. Most inmates in the penitentiary are discharged, either because they have completed their sentence or (and this makes up the majority of the cases) because they are paroled. Of those sentenced to life imprisonment who are paroled, the average length of time served in prison is somewhere between fifteen and sixteen years.

It is much different, of course, with respect to a capital murder life sentence, as that is for life without possibility of parole for fifty years. A capital murder defendant under that sort of life sentence knows that he must serve a minimum of fifty years. Not so, however, for the inmate serving the ordinary type of life sentence.

Defendant was sentenced to life imprisonment in 1974. Although he stabbed inmate King in 1979, it does not follow that until that time he had not conducted himself in accordance with the prison rules and regulations and had caused no trouble. There is nothing in the record to the contrary. He may have been one of those serving a life sentence who otherwise would have been paroled in due course. How can it be said then that the imposition of another life sentence upon him, this time without possibility of parole for fifty years, amounts to no more than a signal "that there is no real cost for prisoners who kill while in confinement" and that nothing less than death amounts to more than a slap on the wrist?

There is no evidence before us to support the assumption that only the death sentence could serve as a deterrent to this particular defendant or others in his class. I am unwilling to make the assumption which the principal opinion has to make in order to affirm the defendant's sentence of death.

The principal opinion uses the rational basis test to uphold the constitutionality of § 565.012.2(9). In order to use this test, it must first conclude that the statute does not impinge on "fundamental personal rights" because society has already deprived prisoners of liberty. I cannot agree with this analysis. Because a person is impris-

---

1. According to the 35th Annual Report of the Missouri Board of Probation and Parole 5 (1980–81), "Sooner or later, 98% of all prisoners are released."

oned, whether for life or for a short period of time, does not mean that that person has lost his "fundamental personal right" in life itself. The appropriate standard of review of this classification is the strict scrutiny test because the statute *does* trammel fundamental personal rights. Under this test, we should look at the state's interest, determine whether it is compelling, and then determine if the statute impinges on the fundamental personal right in the least restrictive manner. *See generally, Shapiro v. Thompson,* 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); L. Tribe, American Constitutional Law ch. 16 (1978). Under this analysis, this aggravating circumstance, § 565.012.2(9), would be unconstitutional because it is overinclusive. It does not differentiate between those who have nothing more to lose for a killing in prison unless they receive the death penalty and those who are not in that class.

I also point out that the principal opinion, as well as § 565.012.2(9) itself, is overinclusive. It lumps everyone in prison into the same category, whether there on a short sentence, such as a two year minimum, or there on a sentence which because of time already served will be completed in a short time or terminated by parole in a reasonable time. There are many prisoners to whom the penalty of further imprisonment under the capital murder statute, involving as it does life imprisonment without possibility of parole for fifty years, would be the strongest kind of deterrent.[2] Yet the justification used by the principal opinion for affirming the death penalty is that to do otherwise means there is no real cost for prisoners who kill while in confinement. The facts of real life are otherwise.

2. It would be different, of course, for a capital murderer who is already under a life sentence without possibility of parole for fifty years, but that is not this case and the statute does not so limit itself.

It is my understanding that the present population of the state penitentiary in Jefferson City is approximately 1,900 to 2,000 and that of these approximately 80 to 85 inmates are serving a capital murder life sentence without possibility of parole for fifty years. If this group

## ON MOTION FOR REHEARING

## PER CURIAM.

 Appellant in his motion for rehearing contends that the trial court erred in failing to instruct the jury on first degree murder as a lesser included offense. There was no objection at trial to the failure to so instruct the jury, and appellant did not raise the point in his motion for new trial. It is raised here for the first time in appellant's reply brief, but it attempts to raise a new matter rather than reply to matters raised in the state's brief. Such is impermissible. *State v. Brown,* 502 S.W.2d 295, 306 (Mo.1973), *cert. denied,* 416 U.S. 973, 94 S.Ct. 1999, 40 L.Ed.2d 562 (1974).

 Appellant argues that we should review the point for plain error. Rule 29.-12(b). After careful consideration we conclude that there has been no "manifest injustice or miscarriage of justice," *id.,* that would necessitate reversal. The trial court instructed the jury on second degree murder and manslaughter, and the jury thus had the opportunity to convict appellant of a lesser offense. *See Beck v. Alabama,* 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980). Moreover, the evidence in this case would not support an instruction on first degree (felony) murder because none of the five enumerated felonies, § 565.003, RSMo 1978, was present. Due process therefore is not abridged. *Hopper v. Evans,* —— U.S. ——, 102 S.Ct. 2049, 72 L.Ed.2d 367 (1982).

The motion for rehearing is overruled.

increases on the average of 20 per year, there will be around 1,000 such inmates in the penitentiary before any one of them is eligible for parole. I think it is to this class of inmates that the suggestions which the principal opinion attributes to the United States Supreme Court that an intentional killing by an inmate might justify mandatory imposition of the death penalty might apply. To repeat, the present is not such a case.