**STATE of Missouri,
Plaintiff-Respondent,**

v.

**William Henry EGGERS,
Defendant-Appellant.**

**No. 46738.**

Missouri Court of Appeals,
Eastern District,
Division Four.

July 17, 1984.

Motion for Rehearing and/or Transfer to Supreme Court Denied Aug. 28, 1984.

Application to Transfer Denied
Oct. 9, 1984.

Timothy M. Gardner, Clayton, for defendant-appellant.

John Ashcroft, Atty. Gen., John M. Morris, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

KELLY, Judge.

William Henry Eggers was convicted of capital murder, § 565.001, RSMo 1978, in the Circuit Court of St. Louis County, Missouri, and was sentenced to life imprisonment in the Missouri Department of Corrections, without probation or parole for fifty years. He appeals. We affirm.

Three Points of Error are raised by appellant. His first Point is that the trial court erred in denying his Motion for Judgment of Acquittal at the close of the state's evidence and at the close of all of the evidence, and in overruling his Motion for Judgment of Acquittal or in the Alternative for a New Trial because there was no substantial evidence that he willfully, knowingly, deliberately, and with premeditation killed or caused the killing of Richard Davis, in that the evidence and reasonable inferences therefrom support no finding that he, at any time prior to his firing the second shot from a .22 caliber rifle:

1) ever intended to take Richard Davis' life; or

2) ever knew that by firing that shot he was practically certain to cause Richard Davis' death; or

3) ever considered taking Richard Davis' life; or

4) ever reflected on taking Richard Davis' life cooly and fully.

In determining whether the evidence is sufficient to support a criminal conviction, we, as a reviewing court, must accept as true all evidence and inferences to be drawn therefrom tending to support the verdict and disregard all evidence to the contrary. It is not our function to substitute our judgment for that of the jury, but, rather, to determine whether the evidence, considered in the light most favorable to the state, is sufficient to support the verdict. *State v. Strickland,* 609 S.W.2d 392, 395 (Mo.1980).

Viewed in this light, the state's evidence was that on May 16, 1979, appellant was the attendant-in-charge and on duty at the Clark Service Station at 1620 Hanley Road, Richmond Heights, St. Louis, County, Missouri. Another attendant, Bruenger, was also on duty at the service station. Richard Davis, the victim, and four other black youths rode their bicycles into the service station, ostensibly to purchase sodas. The Clark station's four soda machines were aligned outside the service station's office, together with an ice machine and a pay telephone. Three of the four soda machines were coin-operated; the fourth was a large refrigerated glass case secured with a padlock. None of the youths purchased or consumed any soda.

At about 11:00 p.m. Robert Mason, a resident of the neighborhood, drove into the service station in his van. At this time the youths were bunched together just outside the office door of the service station with both of the service station attendants inside. A loud argument was in progress, the subject matter of which is not in evidence, other than that one of the black youths, Buie, demanded that Eggers change a dollar bill. Eggers finally made change for the dollar bill despite a policy of the service station against making change at that time of night.

The evidence also suggests that there was an argument going on between Bruenger and Davis, but what it was about is not in evidence.

At some point in time between the arrival of the black youths on the scene and Mr. Mason's appearance Eggers locked the glass soda case, went to his car and removed a rifle from the trunk of his car, brought it back to the service station, and laid it out on the counter "pointing down to it" so that all could see that he had it.

Shortly after Mr. Mason's arrival on the premises Mr. Eggers was "just kind of nervous, walking around * * * [saying] a whole lot of stuff like I'm tired of you, I'm sick of you and stuff like that * * *." The attendants were trying to get the youths to leave, saying they didn't want any trouble.

Appellant is a white man in his early fifties, small in stature, and had difficulty walking because both of his knees had been broken in an automobile accident some years prior to this occurrence. The victim was a 14 year old youth, six feet tall and weighed approximately 155 pounds. The other attendant, Bruenger, also a caucasian, was short and slightly built, and younger than appellant.

Some minutes after appellant got the rifle out of the trunk of the car and took it into the service station, he came out of the building with the rifle, ordered Bruenger to call the police and while wildly pointing the gun at the youths yelled something to the effect, "either get a soda or get the hell off the lot." The youths mounted their bikes to leave the premises by Hanley Road. Appellant stepped down off the concrete step of the service station office, fired one shot into the air and again yelled at the youths to get off the lot.

All of the youths except Davis were, by this time, either off the lot or in the process of departing therefrom. Davis, who had started to leave with the other four young men, lagged behind. According to Mason, after the first shot into the air, Davis was

leaning on a car parked near the pumps alongside the route the other youths had used in leaving the premises, just standing there as if nothing was happening, on or nearly on his bike, and at a point "two long steps" opposite Bruenger, who was calling the police on a pay phone as he had been directed to do by appellant. Bruenger and Davis exchanged some words, when Bruenger suddenly dropped the telephone receiver, declared "You are not going nowhere," and bounded the two steps from the phone to Davis, pushing Davis off his bike and onto the trunk of the parked car. According to Mr. Mason, Davis was "getting up off" or "comin' up off" the trunk of the car when Bruenger yelled, "Shoot that nigger!" While Davis was leaning against the car, facing away from appellant, appellant shot Davis in the back from a distance of five or six feet.

After shooting Davis the appellant advanced upon him with his rifle levelled until Mason intervened, saying, "he is already shot ... don't shoot him again." The police arrived on the scene shortly thereafter and the appellant told one of the police officers that he had "shot a nigger." At the time he made this statement appellant was categorized as "calm" and "nonchalant." Davis was unarmed and had neither attacked nor threatened appellant.

Davis died from the wound he had received at appellant's hand at 2:45 a.m. the following morning.

The defense offered no evidence.

The jury found appellant guilty of capital murder. In the punishment hearing the state introduced evidence of appellant's prior convictions of rape, sodomy and exhibiting a deadly weapon. Appellant called his sister to testify as a witness in mitigation. The jury assessed appellant's punishment at life imprisonment without possibility of probation or parole for 50 years.

■ With respect to appellant's claim that there is insufficient evidence to support a finding that he intended to kill Davis, we hold that there was. It is universally held that everyone is presumed to intend the natural and probable consequences of his own intentional act. *State v. Hammonds*, 459 S.W.2d 365 [1] (Mo.1970). Where one uses a deadly weapon likely to produce death in making an assault upon another, and death ensues, the one who used said deadly weapon is presumed to intend death will result. In *State v. Strickland*, id. l.c. 394, the court said, "A killing through the use of a deadly weapon on a vital part of the body of the victim is sufficient to permit a finding of intent to kill."

■ We believe that under the facts of the case the jury had before it sufficient evidence to support its verdict. Appellant shot Davis in the back with a .22 caliber rifle from a distance of five or six feet after his co-worker had pushed the youth off of his bicycle and shouted, "shoot that nigger." According to the testimony of a deputy medical examiner the bullet fired by the appellant into the body of the victim was a "hollow point" bullet designed to fragment when it struck an object. The bullet performed as designed; fragments from the bullet struck Davis in the heart, lung, pulmonary artery and pulmonary vein.

Appellant also contends there was insufficient evidence to support a finding of deliberation and premeditation.

■ "Deliberation" in a case of capital murder, means that the defendant considered the taking of another's life while in a cool and deliberate state of mind. It is not necessary, however, that the actor brood over his actions for an appreciable period of time. *State v. Armbruster*, 641 S.W.2d 763, 765 [2] (Mo.1982).

■ "Premeditation" means thought of beforehand for any length of time, however short; this simply means that the accused thought about what he was about to do before he did it. *State v. Lieberknecht*, 608 S.W.2d 93, 99 [12] (Mo.App.1980). It is not necessary for the state to produce direct evidence of an accused's premeditation and deliberation; the mental elements establishing murder may be proved by indi-

rect evidence and inferences reasonably drawn from the circumstances surrounding the slaying. *State v. Turner*, 623 S.W.2d 4, 7 [3] (Mo. banc 1981).

 We hold that there was sufficient evidence to support the jury's finding of deliberation and premeditation. In addition to the facts set out hereinabove, Eggers went to his car and removed the loaded rifle therefrom. He brought it into the station and set it on the counter so that it could be seen by the youths through a window. He came out of the service station building wildly pointing the gun at the boys, fired one shot and ordered them off the lot. After he shot Davis in the back, he came around the car Davis was leaning against and while doing so he still had the gun levelled on Davis. Mason told appellant, "he's already shot ... don't shoot him again." When one of the police officers arrived on the scene appellant was calm and nonchalant. Appellant told the police officer that he had just "shot a nigger."

We hold that there is no merit to appellant's first Point and rule it against him.

Appellant's second Point is that the trial court erred in denying his motion not to exclude jurors disqualified by the Witherspoon Rule from the guilt phase of the trial because the systematic exclusion of such jurors; (1) results in a jury that is prone to conviction and therefore is not a fair and impartial jury, and (2) eliminates a significant and distinct segment of the population from the jury panel thereby denying the defendant a fair and impartial jury, both in violation of the Sixth Amendment to the Constitution of the United States.

Appellant candidly recognized that our Supreme Court has rejected the "guilt

prone" argument herein presented. *State v. Mitchell*, 611 S.W.2d 223 (Mo. banc 1981); *State v. Mercer*, 618 S.W.2d 1, 8 (Mo. banc 1981); *State v. Blair*, 638 S.W.2d 739 (Mo. banc 1982); and more recently *State v. Guinan*, 665 S.W.2d 325 (Mo. banc 1984). He urges us however, to carefully review this Point because he contends that he has, for the first time, presented substantial evidence on the record that death qualified jurors are more guilt prone and that these persons excluded by the Witherspoon Rule from the guilt phase of a capital murder trial are a distinct and significant segment of the community.

On January 21, 1980, appellant filed a Motion in Limine to prohibit the prosecuting attorney from conducting a voir dire examination regarding the death penalty. This motion was overruled. Subsequently, on April 27, 1981, appellant filed a motion not to exclude jurors disqualified under *Witherspoon v. Illinois* from the guilt phase of the trial and supported this motion with a brief and an affidavit of Robert M. Berry, an Associate Professor of Psychology and Criminal Justice at the University of Arkansas, and author of: Berry, *Death-Qualification and the "Fireside Induction."* 5 U. of Ark.—Little Rock L.J. 1 (1982). His motion also presented five studies [1] and two cases [2] in support of his contention that *Witherspoon* qualified jurors are conviction prone.

According to Berry's affidavit he is familiar with all of the significant studies relating to death qualified juries cited in *Grigsby v. Mabry*, and in *Hovey v. Superior Court of Alameda County*; and based upon his examination of these studies and of independent research, it is his opinion

**1.** *Grigsby v. Mabry: A New Look at Death Qualified Juries*, by Daniel A. Casey, 18 Amer.Crim.L. Rev. 145 (Summer 1980); Dr. Fay Goldberg, *Toward Expansion of Witherspoon: Capitol Scruples, Jury Bias, and Use of Psychological Data to Raise Presumptions in the Law*, 5 Harv. Civ.Rights-Civ.Lib.L.Rev. T3 (1970); Jurow, *New Data on the Effect of a "Death Qualified" Jury on the Guilt Determination Process*, 84 Harv.L.Rev. J67 (1971); Louis Harris & Associates, Study No. 2016 (1971) reported in part in White, *The Constitutional Invalidity of Convictions Imposed*

*by Death Qualified Juries*, 58 Cornell L.R. 1176 (1973); Ellsworth et al., *Juror Attitudes and Conviction Proneness: The Relationship between Attitudes towards the Death Penalty and Predisposition to convict*. (1979, prepub. draft).

**2.** *Grigsby v. Mabry*, 483 F.Supp. 1372 (E.D.Ark. 1980); *Hovey v. Superior Court of Alameda Cty.*, 28 Cal.3d 1, 168 Cal.Rptr. 128, 616 P.2d 1301 (1980).

that these studies conclusively show that jurors who either favor or do not oppose the death penalty are more prone to render verdicts of guilty than are jurors selected without regard to death penalty scruples. He further states that other studies show that persons opposed to the death penalty comprise a significant and distinct segment of the population which is more likely comprised of a greater portion of blacks, females and certain religious persuasions than a random sampling of the population. Appellant's motion was denied.

On May 1, 1981, appellant also filed a motion for individual voir dire and sequestration of jurors during voir dire. This motion too was overruled.

Impanelling of the jury commenced, and a panel of forty prospective jurors was sworn. During the course of voir dire examination of the panel appellant's counsel inquired whether any members of the panel were so opposed to the death penalty that they would not impose it even if they believed the evidence, beyond a reasonable doubt, warranted the death penalty. Nine of the panel responded affirmatively.

These nine jurors were then separated from the rest of the panel and the trial court then inquired whether these jurors would follow the jury instructions if they included the possibility of the death penalty. Seven of these members of the panel indicated that they would not follow instructions containing such a possibility. The trial court then struck these seven from the panel. Another member of the panel was struck by the trial court because he stated that he felt that the only proper punishment for a defendant convicted of capital murder was death.

Our Supreme Court addressed this same contention in *State v. Mercer*, id. and held that the exclusion of jurors who have stated unambiguously that they cannot, under any circumstances, consider a certain punishment permissible under the law does not violate representative cross-section requirements of Amendments VI and XIV to the United States Constitution.

Following *Witherspoon* a number of studies were published on a theory that "death-qualified" jurors are not impartial on the issue of guilt, and the trial court was made aware of these. These studies, although informative, are not conclusive, and we are not prepared to hold on the basis of these studies that the trial court erred in overruling appellant's motion and in impanelling the jury as it did.

Those chosen to serve as jurors in this case in no way indicated that they were biased for the prosecution and against appellant when they merely said that they would consider a punishment provided by law if the facts permitted it. As the court in *Spinkellink v. Wainwright*, 578 F.2d 582, 594 (CA 5, 1978) cert. denied 440 U.S. 976, 99 S.Ct. 1548, 59 L.Ed.2d 796 (1979) said: "[T]he veniremen indicated only that they would be willing to perform their civic obligation as jurors and obey the law. Such persons cannot accurately be branded prosecution-prone."

In order to establish a prima facie violation of the fair cross-section requirement of the Sixth Amendment, appellant had to prove:

1. the persons excluded from jury service must be members of a "distinctive group in the community";

2. the representation of this group in venires is "not fair and reasonable in relation to the number of such persons in the community";

3. the underrepresentation is due to a "systematic exclusion of the group in the jury selection process."

*Duren v. Missouri*, 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1978).

We conclude that we are compelled to follow the law on this question as set forth in *State v. Mercer*, id. Even if a prima facie violation of the fair cross-section requirement was made, the state has a significant interest in impanelling only those jurors who have stated that they can follow the law,

The exclusion of those venire persons who have stated unambiguously that

they cannot, under any circumstances, consider a certain punishment permissible under the law does not violate representative cross-section requirements of the sixth and fourteenth amendments * * *. The right to a representative jury does not include the right to be tried by jurors who have explicitly indicated an inability to follow the law." *State v. Mercer*, id. l.c. 7.

The Supreme Court in *Mercer* was referred to seven studies,[3] and nevertheless reached the decision quoted from hereinabove. The Jurow and Goldberg studies relied upon by appellant, were among those seven studies considered in *Mercer*. Appellant claims that two other studies, Harris and Ellsworth, when considered with the *Grigsby* and *Hovey* decisions are sufficient to distinguish his claims from the decision reached in *Mercer*. We do not agree.

Appellant's second Point is ruled against him.

The third Point appellant presents for review is that the trial court erred in overruling his request for "court assessed sentencing following jury-determined verdict and his Motion in Limine to limit the voir dire examination regarding the death penalty" because: (1) other non-capital and capital murder defendants possess the right to be sentenced by the court alone thereby depriving defendant of his liberty without due process and denying defendant equal protection of the law, and (2) the voir dire resulted in a jury willing to impose death while excluding veniremembers qualified to find defendant guilty of capital

murder thereby denying defendant a trial by an impartial jury.

Appellant relies on § 557.036.2, RSMo 1978, which provides that the court shall instruct the jury as to the range of punishment authorized by statutes and upon a finding of guilt assess and declare the punishment as a part of the verdict only where the defendant has, in writing, requested the court to assess the punishment in case of a finding of guilt.[4]

We believe appellant's Point is without merit because the question has already been decided contrary to his position. On or about February 4, 1980, appellant filed a Petition for Writ of Prohibition in the Supreme Court of Missouri in an effort to prevent the circuit judge from proceeding with the trial of this case in which he contended that after a jury determined that he was guilty of capital murder he should be allowed under § 557.036.2, RSMo 1978, to change the course of trial by waiving further service of the jury and require the judge alone to hear evidence in the second stage of the bifurcated capital murder procedure provided by § 565.006.2, RSMo 1978, and assess punishment. *State ex rel. Eggers v. Enright*, 609 S.W.2d 381 (Mo. banc 1980).

The court in Eggers concluded that the trial judge was acting within the authority conferred upon him by Ch. 565, RSMo 1978, that these statutes were not a part of the "New Criminal Code" and were enacted separately from the Code as House Bill 90

**3.** Defendant cites the following: V. Boehm, *Mr. Prejudice, Miss Sympathy* and the *Authoritarian Personality;* An *Application of Psychological Measuring to the Problem of Jury Bias,* 1968 Wisc.L.Rev. 734; E. Bronson, *On the Conviction-Proneness and Representativeness of the Death-Qualified Jury: An Empirical Study of Colorado Veniermen,* 42 U.Colo.L.Rev. 1 (1970); F. Goldberg, *Toward Expansion of Witherspoon: Capital Scruples, Jury Bias, and Use of Psychological Data to Raise Presumptions in the Law,* 5 Harv. Civil Rights—Civil Liberties L.Rev. 53 (1970); E. Jurow, *New Data on the Effect of a "Death-Qualified Jury" on the Guilt Determination Process,* 84 Harv.L.Rev. 567 (1971); M. Rokeach & D. McLellan, *Dogmatism and the Death*

*Penalty: A Reinterpretation of the Duquesne Poll Data,* L.Rev. 125 (1969–70); W. White, *The Constitutional Invalidity of Convictions Imposed by Death-Qualified Juries,* 58 Cornell L.Rev. 1176 (1973) (reporting 1971 Harris Poll data); H. Ziesel, *Some Data on Juror Attitudes Toward Capital Punishment* (1968) published by the center for Studies in Criminal Justice, University of Chicago Law School.

**4.** Section 557.036 was amended in 1981 to require this request to be made prior to voir dire. This case was tried in May, 1981, and the amendment did not become effective until September 28, 1981.

in 1977.[5] The court quashed the preliminary writ.

 Section 565.006.2, RSMo 1978, provides that in capital murder cases in which the death penalty may be imposed by a jury or judge sitting without a jury, the additional procedures provided by § 565.-012, RSMo 1978, shall be followed. *The jury,* or *the judge in cases tried by a judge,* shall fix a sentence within the limits prescribed by law. (Emphasis supplied). The court held "the capital murder statutes deal only and particularly with that non-code crime and its discrete trial and sentencing procedures. Nothing in our law contemplates that capital murder's unique trial and sentencing mechanism be applicable to any other crime." *Eggers,* id. at 384. The decision pointed out that, in contrast, § 557.036.2, RSMo 1978, addresses itself in broad terms to sentencing procedures in general and the special capital murder statute, § 565.006.2, RSMo 1978, was the applicable statute in capital murder cases. We agree.

With respect to appellant's contention that the voir dire of the jury on the Witherspoon question results in an impartial jury, we have already disposed of that argument hereinabove in deciding appellant's second Point.

 Furthermore, we fail to see how appellant was prejudiced in the jury's assessing punishment, when it did not impose the death penalty, as it might have. The only alternatives available to either a jury or the trial court, once a finding of guilt in a capital murder case is returned, is death or life imprisonment by the Division of Corrections during his natural life and he shall not be eligible for probation or parole until he has served a minimum of fifty years of his sentence. § 565.008, RSMo 1978. The jury here chose the lesser punishment for the crime; the trial court could have done no more for the appellant.

We rule this Point against appellant and affirm the judgment of the trial court.

PUDLOWSKI, P.J., and SMITH, J., concur.

---

5. The "New Criminal Code," containing § 557.-036.2 was enacted in Laws of 1977 as Senate Bill 60, became effective January 1, 1979.