**STATE of Missouri, Respondent,**

v.

**Christopher DICKSON, Appellant.**

**No. 48653.**

Missouri Court of Appeals,
Eastern District.
Division Two.

April 2, 1985.

Motion for Rehearing and/or Transfer to
Supreme Court Denied May 17, 1985.

Application to Transfer Denied
June 25, 1985.

William L. Webster, Atty. Gen., Michael H. Finkelstein, Asst. Atty. Gen., Jefferson City, for respondent.

Henry Robertson, St. Louis, for appellant.

JOHN C. CROW, Special Judge.

Appellant, indicted for capital murder, § 565.001, RSMo 1978, for the February 25, 1983, killing of Beatrice Gillion in the City of St. Louis, was found guilty by a jury as charged. Punishment was fixed at imprisonment for life without eligibility for probation or parole until appellant has served a minimum of 50 years. § 565.008.1, RSMo 1978.

Appellant insists the evidence was insufficient to establish that the homicide was deliberate and premeditated, being instead "more consistent with a killing in sudden anger." He also complains about the receipt in evidence of the victim's "blue jeans," coat and a "green trilobal fiber" found on the coat by a criminalist of the St. Louis Metropolitan Police Department. Lastly, appellant assigns error in the trial court's sustaining of an objection by the prosecutor to a portion of appellant's lawyer's closing argument.

In ruling appellant's challenge of the sufficiency of the evidence to support the conviction, we view the evidence and all inferences reasonably to be drawn therefrom in the light most favorable to the verdict and disregard all contrary evidence and inferences. *State v. McDonald*, 661 S.W.2d

497, 500[1] (Mo. banc 1983). We determine only whether the evidence, so viewed, is sufficient to make a submissible case from which reasonable jurors could have found appellant guilty as charged. *State v. Wood*, 596 S.W.2d 394, 400[10] (Mo. banc 1980), *cert. denied*, 449 U.S. 876, 101 S.Ct. 221, 66 L.Ed.2d 98 (1980).

Cast in that light, the evidence establishes that Beatrice Gillion, age 27 or 28, accompanied by her "two little boys," arrived at 5534 Beacon Avenue, the residence of her sister, Patricia Gillion, on Friday morning, February 25, 1983. According to Patricia, it was Beatrice's habit to come there once a week to wash clothes. Patricia, having departed for work about 7:20 a.m., was not home when Beatrice and her sons arrived. However, Patricia spoke to Beatrice by phone about 9:30 that morning when Beatrice called Patricia at work.

Jo Ann Johnson, who lived with her mother at 5531 Beacon, went to Patricia Gillion's residence about 12:40 p.m., that day to borrow a cup of milk. Jo Ann, who knew Beatrice and appellant, pushed the door open and walked into the living room. There, she saw Beatrice on the floor. Thinking Beatrice had fainted, Jo Ann walked toward her. Asked what she saw, Jo Ann answered, "Blood and her eyes was open, and a knife in her." Jo Ann started screaming and ran outside toward her mother's home.

En route, Jo Ann passed appellant "[s]tanding in the street right by the curb." Jo Ann said, "Chris, Chris, go in there, Beatrice is dead."

Asked whether appellant responded, Jo Ann testified, "No, he just stood there for a little while."

Jo Ann told her mother, who was on their front porch, what she had seen. Jo Ann then saw appellant approach Patricia Gillion's residence. In Jo Ann's words, "He walked up the steps slowly and he opened the screen door and he looked in, then closed it and he came back down the steps."

Police officers Robert Siscel and Joseph Callahan were dispatched to the scene by radio, arriving about 12:45 p.m. Upon entering Patricia's home, they saw Beatrice lying on her back "with blood on her chest, and her clothes disarrayed." Siscel explained, "She had a butcher knife in her abdomen." The officers attempted to take a pulse on Beatrice's wrist and neck, but detected none.

Patricia Gillion was notified and she returned home, finding Beatrice's sons at 5523 Beacon, the home of Eleanor Johnson, appellant's mother. Jo Ann Johnson explained that Eleanor Johnson "baby sat" Beatrice's children and that Beatrice formerly dated appellant's brother. According to Jo Ann, appellant and Beatrice had a "friendly relationship."

Police officers Elmer Morris and John Bernard arrived at the scene and began interviewing bystanders. Their attention was directed to appellant, who was walking in the street near Jo Ann Johnson's home. Morris testified: "I noted that his clothes appeared to have been in a disarrayed condition. The shirt was open at the top and wrinkle [sic] as if he had been involved in a fight. I also noticed that there were blood stains on his coat that he was wearing, and a scratch on the lower part on the chest directly under his neck."

Morris asked appellant his name, address, and how he had gotten the blood on his coat. According to Morris, appellant stated he had scratched himself on a fence by a garage. Morris continued, "At the time that he was telling me how he scratched himself on the fence, he pulled up his jacket and showed me a mark on his arm that did not appear to be a scratch, but, instead, it appeared to be a human bite mark."

Morris and Bernard arrested appellant, taking him to the district police station. Bernard testified that after they arrived, appellant sat down and, at that time, a white button fell from appellant's shirt to the floor. Bernard, observing that appellant's shirt was "torn," retrieved the button, holding it as evidence.

Police officer Harvey Laux, an evidence technician, processed the scene where Beatrice's body lay. Clothing on the body included a bloodstained coat and blue jeans. Photographs of the body taken by Laux show the jeans open in front with a tear several inches long in the crotch beneath the zipper.

Laux removed the knife from Beatrice's abdomen. He described the knife as a "fourteen and a half inch Chef knife with a nine and three quarter inch blade." Beneath the body, Laux discovered a white button with "[p]ieces of clothing attached by the thread."

Laux went to the police station where appellant was being held. Bernard gave Laux the button that had fallen from appellant's shirt.

Laux took photographs of appellant, including that area of appellant's left forearm where officer Morris had seen what he described as a human bite mark. Laux thereafter accompanied appellant to the police laboratory where Laux took additional photographs of appellant's left forearm. Laux then took possession of several items of appellant's clothing, including his coat and shirt. Laux turned the clothing over to laboratory personnel.

Harold Messler, a criminalist at the police laboratory, examined appellant's left forearm, observing "a damaged place on the skin that appeared to be two puncture marks where the skin was actually broken; and the skin had a raised appearance in this particular area." Messler processed appellant's forearm for the presence of residual saliva, and he also obtained a sample of saliva from appellant's mouth.

A medical doctor specializing in forensic pathology performed an autopsy on Beatrice Gillion's body, observing two bruises on the right upper lip and an abraded area near the corner of the mouth. According to the doctor, these marks indicated some force had been applied to the mouth. Inside the mouth, the doctor noticed bruising on the lining of the mouth and "around the right upper tooth in the canine area."

The doctor found several bruises on the neck, a fracture of the left side of the thyroid bone "right above the Adam's Apple," and a fracture of the left side of the thyroid cartilage. These observations, coupled with some "pinpoint hemorrhaging" in the whites of the eyes and on the gums, indicated to the doctor that "strangulation was present in this case."

The doctor counted "at least twelve and possibly thirteen" stab wounds. Commenting on one of them, the doctor stated: "The instrument has passed through the skin creating this defect; passed through the breast bone, passed through the sac in the heart. So it cut through right ventrical [sic] of the heart, which is one of the lower chambers of the heart. Passed through the esophagus, which is the tube that feeds from your mouth to your stomach; passed below the 9th rib cutting the 10th rib and out through the back."

Asked about the cause of Beatrice's death, the doctor responded, "Strangulation and multiple stab wounds."

A day or two after Beatrice was killed, Patricia was putting her children to bed in an upstairs bedroom when she noticed a curtain had been torn off the window. Plastic, which Patricia had taped around the window, was hanging outside. She also saw a large button which she picked up and later turned over to a detective.

Victor Granat, a criminalist at the police laboratory, examined appellant's shirt and noted two buttons were missing. Using a "polarized light microscope," he examined a sample of the cloth in appellant's shirt, a sample of the reinforcing material for the buttons on appellant's shirt and a sample of the thread attaching the buttons to appellant's shirt. He also examined the thread and cloth attached to the button found by Laux beneath Beatrice's body. Granat concluded, to a reasonable degree of scientific certainty, that the cloth, reinforcing material and thread from appellant's shirt were the same respective types as the cloth and thread attached to the button. Additionally, the cloth attached to the button matched the size and shape of a

hole on appellant's shirt where a button was missing. The printed pattern on the cloth attached to the button matched the pattern around the hole in the shirt. Upon observing this, Granat concluded that the button found by Laux beneath Beatrice's body had come from appellant's shirt.

Granat examined the button that had fallen from appellant's shirt at the police station and concluded it was the same type as the one found by Laux beneath Beatrice's body. Shown appellant's coat, Granat testified that all its exterior buttons were missing. There was, however, a spare button attached inside the coat. That button was the same size, style and general color pattern as the button found by Patricia Gillion in her upstairs bedroom.

Granat testified he scraped appellant's coat for debris, discovering certain "green trilobal fibers" which were not the material from which appellant's coat was made. Granat testified he also scraped Beatrice's coat and found a green trilobal fiber on it. Microscopic examination revealed that the fiber found on Beatrice's coat was of the same color, shape and type as those found on appellant's coat. None of the fibers came from the carpet in Patricia's home. Granat's testimony regarding Beatrice's coat and the fibers was received without objection.

Granat identified a pair of blue jeans that he had received from the morgue, pointing out that they were torn in the crotch below the zipper. This testimony was likewise received without objection.

Joseph Crow, a criminalist specializing in the typing of blood and other body fluids, performed a series of tests on a sample of Beatrice Gillion's blood furnished by the doctor who performed the autopsy. Crow's tests revealed that the blood type ("B") and enzyme characteristics of Beatrice's blood appeared in only .65 per cent of the population. Blood on the knife removed from Beatrice's body was type "B" human blood and contained the same enzyme characteristics as Beatrice's blood. Stain on appellant's coat was type "B" human blood and matched Beatrice's enzyme characteristics in all respects except one, which was unreadable.

Crow also examined the swabs used by Messler in processing appellant's left forearm for residual saliva and the saliva sample obtained by Messler from appellant's mouth. Tests on the latter revealed that appellant is a nonsecretor, being among the 20 per cent of the population whose blood type cannot be determined from their saliva.

Tests on the swab from the area around the mark on appellant's left forearm revealed the presence of saliva from a secretor whose blood type was the same as Beatrice's (type "B"). Type "B" secretors are 8 per cent of the population.

Appellant has type "O" blood.

James McGiveny, a forensic odontologist, testified he went to the medical examiner's office on February 25, 1983, and examined the teeth of the deceased Beatrice Gillion. He photographed the teeth and cast some impressions of them. From those impressions he constructed models of Beatrice's upper and lower teeth. Using the photographs taken by Laux of appellant's left forearm, McGiveny made "life size photographs" of the area of the wound.

Employing laboratory, x-ray and photographic procedures that need not be detailed here, McGiveny concluded, to a reasonable degree of scientific certainty, that Beatrice's upper teeth caused the lesions on appellant's left forearm. In McGiveny's opinion, the forearm was forced up and against the teeth, thereby accounting for the absence of bite marks from Beatrice's lower teeth.

Appellant, reminding us that under § 565.001, RSMo 1978, deliberation is an essential element of capital murder and is the element that distinguishes capital murder from murder in the second degree, State v. Gilmore, 650 S.W.2d 627, 629[4] (Mo. banc 1983), argues that the evidence was insufficient to support a finding that he deliberated about killing Beatrice Gillion before taking her life.

Deliberation may be inferred from the circumstances surrounding the homicide. *State v. Davis,* 653 S.W.2d 167, 172[2] (Mo. banc 1983); *State v. Bolder,* 635 S.W.2d 673, 680 (Mo. banc 1982), *cert. denied,* 459 U.S. 1137, 103 S.Ct. 770, 74 L.Ed.2d 983 (1983); *State v. Kyles,* 247 Mo. 640, 153 S.W. 1047, 1050 (1913). A deliberate act is a free act of the will done in furtherance of a formed design to gratify a feeling of revenge or to accomplish some other unlawful purpose and while not under the influence of a violent passion suddenly aroused by some provocation. *Davis,* 653 S.W.2d at 172[7]. A finding of deliberation depends not so much upon the time involved as upon an inference reasonably drawn from the evidence and circumstances surrounding the act. *Id.* at 172; *Bolder,* 635 S.W.2d at 680. It is not necessary that the actor brood over his actions for an appreciable period of time to constitute deliberation. *State v. Armbruster,* 641 S.W.2d 763, 765[2] (Mo.1982); *State v. Ingram,* 607 S.W.2d 438, 443[9] (Mo.1980); *State v. Eggers,* 675 S.W.2d 923, 927[7] (Mo.App.1984).

In *State v. Hurt,* 668 S.W.2d 206 (Mo.App.1984), a case remarkably similar to this one, a penitentiary inmate was found stabbed to death in his cell seconds after his cellmate had departed for "evening yard." Some 26 or 27 knife wounds had been inflicted in vital parts of the body. The cellmate was convicted of capital murder. Rejecting a contention that the evidence was insufficient to support a finding of the element of deliberation, this Court held that the number, severity and location of the wounds provided such a basis and that the inference of deliberation was made more apparent by the fact that the assailant had procured and concealed a knife. *Id.* at 215. The inference was further strengthened by the fact that the assailant failed to seek aid for the victim and gave false statements concerning the homicide. *Id.* at 216.

Circumstances of equal, if not greater, persuasiveness are present in the instant case. In addition to the 12 or 13 stab wounds (one of which passed entirely through Beatrice's body penetrating the heart and esophagus), there was clinical evidence of strangulation. Death was attributed to both sources of trauma, which the jury could reasonably infer did not take place simultaneously.

In this respect, the instant case is similar to *State v. Sturdivan,* 497 S.W.2d 139 (Mo. 1973), where the defendant, after engaging in a homosexual act with the victim, strangled the victim with his hands, then, to ensure the victim was dead, wrapped a towel around his neck and held it in place. The Supreme Court held that the manual strangulation, followed by the towel ligature, supplied sufficient evidence to support a finding of deliberation. *Id.* at 142.

In addition to the two types of trauma inflicted in the instant case (stabbing and strangulation), appellant, like the culprit in *Hurt,* left Beatrice at the site of the assault without seeking aid and gave a false statement to officer Morris about the lesions on his arm. Moreover, the jury could reasonably infer that the Chef knife embedded in Beatrice's body, being an instrument not customarily kept in a living room, had either been brought to Patricia's residence by appellant or obtained by him from another part of the house before the stabbing attack began.

If the evidence in *Hurt* and *Sturdivan* was sufficient to support a finding of deliberation, the evidence in the instant case is indisputably so. Appellant's first point is denied.

Appellant's second point asserts the trial court erred in receiving in evidence, over appellant's objection, Beatrice's blue jeans, coat and the green trilobal fiber scraped from the coat by criminalist Granat. The State, says appellant, "failed to prove a chain of custody adequate to ensure that the exhibits were in the same condition when received and tested as when they were seized."

As earlier noted, Granat's testimony about all three items was received without objection. After the final State witness

testified, the prosecutor offered all of the State's exhibits—80 in number—in evidence. With respect to the jeans, coat and fiber, appellant's attorney[1] made the same objection to the trial court as appellant articulates here in his second point. The trial court overruled the objection and received the three items in evidence. Though appellant discusses all three items in a single point, we treat the jeans separately from the coat and the fiber.

The only evidentiary significance of the jeans was the tear in the crotch beneath the zipper. As recited *supra*, this tear is shown in photographs of Beatrice's body taken at the scene by officer Laux. These photographs were received in evidence and shown to the jury, and no assignment of error is made here as to them.

In *State v. Sherrill*, 657 S.W.2d 731 (Mo. App.1983), the evidentiary significance of trousers worn by the victim was that at the time the victim's body was found, the trousers were soiled with mud and clay, but the pockets, turned inside out, were clean. In *Sherrill*, the condition of the trousers and pockets was shown in a police photograph taken before the body was moved. Noting that the trial judge could have reasonably concluded from the photograph and from the testimony of a witness who viewed the body where it was found that the trousers were in the same condition when found as when offered in evidence, this Court upheld the admission of the trousers. *Id.* at 736.

Here, the trial court and jurors had before them the photographs of Beatrice's body showing the tear in the jeans and could ascertain for themselves whether the torn area was in the same condition at trial as when Beatrice's body was found. The trial judge was obviously satisfied that it was. Moreover, appellant appears likewise convinced at this point, as appellant's counsel, in oral argument before us, abandoned the objection to the jeans. Accordingly, we deny that portion of appellant's second point pertaining to the jeans.

The evidentiary significance of Beatrice's coat and the green trilobal fiber scraped from it by Granat was that fibers of the same color, shape and type were discovered on appellant's coat and none of the fibers came from the carpet in Patricia Gillion's home. The incriminatory inference from this is that all of the fibers were on either Beatrice's coat or appellant's coat before the attack and that during the encounter the coats came in contact, transferring some of the fibers from one to the other.

Appellant argues that absent a showing of the chain of custody of Beatrice's coat, there is no assurance that the green trilobal fiber was on the coat when Beatrice's body was found. Pointing out that Beatrice's coat was on her body while it was in the hands of ambulance personnel and morgue personnel, and that the coat had to be conveyed from the morgue to the police laboratory, appellant argues that the State failed to eliminate the possibility that the green trilobal fiber got on Beatrice's coat after the homicide.

The frailty in appellant's position is that the discovery of the fiber on Beatrice's coat and the resemblance of that fiber to fibers found on appellant's coat was described to the jury by Granat without objection by appellant. It was only later, when the State's exhibits were formally offered in evidence, that appellant objected. His objection was to the items themselves; there was no request to strike Granat's testimony.

With the record in this posture, we note that once the jurors had heard Granat's testimony, they could learn little, if anything, further by viewing Beatrice's coat and the fiber found thereon. It was Granat's testimony about Beatrice's coat and the fiber, not the items themselves, that incriminated appellant.

If evidence is improperly admitted, but other evidence before the court establishes

---

**1.** The attorney representing appellant on this appeal is not the attorney who represented ap-pellant at trial.

essentially the same facts, there is no prejudice and no reversible error. *State v. Zagorski*, 632 S.W.2d 475, 478 n. 2 (Mo. banc 1982); *Harris v. Goggins*, 374 S.W.2d 6, 15 (Mo. banc 1963). In view of Granat's testimony, the subsequent receipt in evidence of Beatrice's coat and the fiber it carried, even if error, could not have prejudiced appellant.

When the objection to these items was made at trial, the prosecutor argued that the objection came too late and should have been made when the items were first mentioned. Appellant, anticipating the same contention by the State here, asks us to review the matter as plain error if we agree that the trial objection came too late.

■ Plain error and prejudicial error are not synonymous. No precise method exists for determining plain error, but it can be said that plain error includes prejudicial error which so substantially affects the rights of the accused that a manifest injustice or miscarriage of justice inexorably results if left uncorrected. *State v. Valentine*, 646 S.W.2d 729, 731[4] (Mo. 1983); *State v. Miller*, 604 S.W.2d 702, 706[5] (Mo.App.1980). As we have determined that because of Granat's antecedent testimony, appellant was not prejudiced by the receipt in evidence of Beatrice's coat and the fiber, it follows that even if the admission of the coat and the fiber was error, such error could not have constituted plain error.

Appellant's second point is denied.

■ Appellant's final assignment of error is easier understood after studying that portion of the prosecutor's argument and that portion of appellant's lawyer's argument on which the point is based.

In the opening segment of the prosecutor's closing argument, he stated, *inter alia:*

"It was a direct confrontation situation in which this poor lady's pants, for some reason, were ripped down from the beltline. Here, actually, the zipper is pulled open, and ripped on down to the crouch [sic] (indicating). And I can understand,

and I think you can understand, that if you're grasping on a person's coat, you know, you're going to rip—if you're trying to hold them back, you pull them back, like that (indicating), you might even tear a belt off if they're trying to get away. You might even pull a shoe off if you tackle them. But how do you do this (indicating)? How do you get to this (indicating)? Is there any other way? I mean, you grab the waistline and you pull. Now, is that to get away, or to hold somebody from getting away? When they have got this bulky coat on that you can grab (indicating)? Or, is it for another purpose, namely, to remove their clothing for a sexual purpose. Granted there's no sexual spermatozoa or seminal fluid, or that sort of stuff found, but, you know, it didn't get that far. She struggled too much.

Now, let's look—go to the question of the word we left out, 'defendant.' You know, all of these things that I have talked about so far definitely proves the coolness and fullness, of the deliberateness of purpose of the person that did this, and the intent of the person that did this."

During the closing argument of appellant's lawyer, this transpired:

"[APPELLANT'S LAWYER]: In this instruction on capital murder, the second element is that the defendant intended to take the life. 'Intended to take the life.' And, then, you know, in addition to 'intend,' you have to look to this premeditation, to this cool, calm, reflective thought. Premeditation. Premeditation. And the circuit attorney wants to tell you that because someone was stabbed this many times—and there's no denying that the person was stabbed—and because it was some strangulation that, automatically, beyond a reasonable doubt, that that person cooly [sic], calmly thought about what he was doing; that there's no other reasonable explanation; that the person wasn't in a fit of rage; or going beserk [sic] over something. And, then, he wants to tell you that, 'Well, he went

over there to try to rape this woman and he killed her.' Well, you know if a person is killed while another is committing a felony in this—

[PROSECUTOR]: Wait a minute. I object to him instructing the jury on law that's not given to them by the court.

THE COURT: Sustained."

At that point, there was a sidebar conference:

"[APPELLANT'S LAWYER]: Your Honor, I'm certainly allowed to argue that this could be evidence of crimes not charged.

[PROSECUTOR]: You can talk about that instruction.

[APPELLANT'S LAWYER]: I can certainly talk about the fact that this could be evidence of a crime not charged.

THE COURT: But I don't think you can give them—explain to them—If you can't tell them other than what's in the instructions what the law is in this case I don't know how you can go about telling them what the law is in another case.

[PROSECUTOR]: It is the law that you can't read a law book to the jury. You can't. You know.

[APPELLANT'S LAWYER]: Your Honor, it is one thing. But he has opened the door here. He's the one that brought up all of the allegations that he went over there trying to rape her and killed her. How do you respond to that? You have to respond to that.

THE COURT: I know that he has indicated rape.

[APPELLANT'S LAWYER]: Indicated sexual assault.

THE COURT: He said sexual motives.

[PROSECUTOR]: That's it, yes.

[APPELLANT'S LAWYER]: He indicated attempted rape, Your Honor.

THE COURT: What you would be doing would be instructing this jury on the elements of other crimes.

[APPELLANT'S LAWYER]: He has been trying to introduce and he's arguing. He's arguing the law. He's arguing the fact that indicates another crime. And I'm to respond to that. He's opened the door.

[PROSECUTOR]: He's responded to that.

THE COURT: I don't think he has indicated a crime. He said for sexual purposes. But he hasn't gotten into or at least indicated a sexual assault.

[APPELLANT'S LAWYER]: But the attempt is just as—counts the same as the perpetration of the crime, under the crime of murder first degree whether it's rape or attempted.

THE COURT: I'm going to sustain the objection." Appellant assigns error, stating the point thusly:

"The trial court erred by sustaining the State's objection to defense counsel's argument to the jury, that an attempted rape of the victim by appellant would not show deliberation but felony-murder, because this argument was not an impermissible attempt to instruct the jury on the law but was instead proper retaliatory argument, within the issues and the evidence, and consistent with the court's instructions. The State's argument that appellant had a 'sexual purpose' indicative of deliberation was properly subject to the counterargument that attempted rape did not show deliberation, which could be demonstrated by contrasting capital murder with felony-murder."

Assuming, without deciding, that the comments of appellant's lawyer to the trial court were sufficient to preserve the point asserted here, we find the point without merit. The jurors were not instructed that they could find appellant guilty of first degree murder, § 565.003, RSMo 1978.[2] Appellant did not argue to the trial court, and does not argue here, that such an instruction should have been given. The

**2.** Section 565.003, RSMo 1978 (now repealed), provided, in pertinent part: "Any person who unlawfully kills another human being without a premeditated intent to cause the death of a particular individual is guilty of the offense of first degree murder if the killing was committed in the perpetration of or in the attempt to perpetrate ... rape...."

jurors were instructed on capital murder, murder in the second degree, § 565.004, RSMo 1978, and manslaughter, § 565.005, Laws 1982, p. 685.

It is thus evident that if appellant's lawyer, at the time of the prosecutor's objection, was intending to argue to the jury that a killing during an attempted rape would constitute "felony-murder," such an argument would have been outside the instructions. While counsel may argue the facts as they pertain to the law declared in the instructions of the court, *State v. Jordan*, 646 S.W.2d 747, 751[3] (Mo. banc 1983), it is improper for counsel to argue questions of law not within the issues or inconsistent with the instructions of the court, or to present false issues. *Id.* at 751. Whether appellant, on the evidence before the jury, was guilty of "felony-murder" was not an issue for the jury to decide.

■ Appellant's lawyer was free, of course, to argue that even if appellant encountered Beatrice with the intent to rape her, but never deliberated about killing her, he was not guilty of capital murder. Such an argument would have been well within the instruction submitting capital murder. But arguing that appellant might be guilty of "felony-murder," an offense not submitted in the instructions, would have been clearly impermissible. *State v. Gadwood*, 342 Mo. 466, 116 S.W.2d 42, 60–61[28] (1937).

Appellant, relying on *Jordan*, 646 S.W.2d at 751, asserts that it is not error for counsel to discuss the law without defining it. However, inasmuch as the jurors had not been instructed on "felony-murder," appellant's lawyer, had he undertaken to discuss that crime, would, of necessity, have had to define it in order for his comments to have any meaning. That, as explained above, is not allowed. The point is denied.

Judgment affirmed.

SIMON, P.J., and STEPHAN, J., concur.